REFRIGERATED TRANSPORT CO., Inc., Alterman Transport Lines, Inc., Clay Hyder Trucking Lines, Inc., Watkins Motor Lines, Inc., Tompkins Motor Lines, Inc., Argo-Collier Truck Lines, Inc., Central and Southern Truck Lines, Inc., Indiana Refrigerator Lines, Inc. (order of 3/31/70)

v.

The UNITED STATES of America and the Interstate Commerce Commission, Spencer Packing Company, Needham Packing Company, American Beef Company, Raskin Packing Company, Farmbest, Inc., Missouri Beef Packers, Inc., Mid States Packing Company and Iowa Beef Packers, Inc. (order of 3/31/70); John Morrell & Co., Geo. A. Hormel & Co. and Oscar Mayer & Co. (order of 3/31/70).

Civ. A. No. 13292.

United States District Court, N. D. Georgia, Atlanta Division.

April 29, 1970.

On Motion for Reconsideration June 22, 1970.

---

Watkins, Daniell, Davis & Serby, Atlanta, Ga., Langston & Massey, Lakeland, Fla., Singer, Lippman & Hardman, Chicago, Ill., for plaintiffs.

John H. D. Wigger, Dept. of Justice, Washington, D. C., Richard W. McLaren, Asst. Atty. Gen., John W. Stokes, Jr., U. S. Atty., for the United States.

882

Jerome E. Sharfman, Interstate Commerce Commission, Washington, D. C., Robert W. Ginnane, Gen. Counsel, for Interstate Commerce Commission.

Kilpatrick, Cody, Rogers, McClatchey & Regenstein, George B. Haley, Jr., Atlanta, Ga., and Jacob P. Billig, Norman C. Barnett, William L. Gardner, Washington, D. C., for intervenors as parties defendants, John Morrell & Co., Geo. A. Hormel & Co. and Oscar Mayer & Co.

Alston, Miller & Gaines, Atlanta, Ga., Eugene D. Anderson, Washington, D. C., for intervenors as defendants, Spencer Packing Co., Needham Packing Co., American Beef Co., Raskin Packing Co., Farmbest, Inc., Missouri Beef Packers, Inc., Mid States Packing Co., and Iowa Beef Packers, Inc.

Before BELL, Circuit Judge, and HOOPER and EDENFIELD, District Judges.

EDENFIELD, District Judge.

This is an action to enjoin, set aside and annul the July 21, 1969, and November 10, 1969, orders which were entered in Interstate Commerce Commission Proceeding No. 35054, relating to Unloading Restrictions on Meats and Packinghouse Products.[1] The district court has jurisdiction under 28 U.S.C. § 1336 and a three-judge court was convened as required by 28 U.S.C. § 2325.

Plaintiffs are motor common carriers operating pursuant to authorization granted by the ICC whereby they transport, *inter alia*, loose meats and carcass meats from midwestern and central states to the southern states. Under the Interstate Commerce Act plaintiffs are required to publish and file with the ICC tariffs setting forth rates, charges, rules, regulations, and practices, governing the services which they perform and such tariffs are on file at the present time. In addition, regulations of the ICC require all motor carriers to file an Annual Report of Freight Commodity Statistics, which includes information such as the total number of truckload shipments transported and the number of tons and gross freight revenue derived from transportation of (1) fresh or chilled meat (except salted), (2) fresh-frozen meat, and (3) meat products. The report does not include any breakdown to show the percentages of loose, carcass, and packaged meats transported.

Plaintiffs allege that prior to the early 1960's all motor carriers required shippers or consignees of loose and carcass meats to be responsible for unloading operations, but during the late 1950's or early 1960's a number of carriers elected to make an exception in their tariffs and thereby agreed to perform certain unloading tasks themselves. Even then the general rule concerning the unloading of meats placed the responsibility upon consignees, but the tariffs contained specific provisions that certain carriers, including the above-named plaintiffs, would be responsible for unloading loose and carcass meats.[2]

1. The ICC's orders were dated July 11th and October 29th but were served on the dates given above.

2. Plaintiffs Tompkins Motor Lines, Inc., Clay Hyder Trucking Lines, Inc., and Watkins Motor Lines, Inc. are all parties to the Motor Carrier Traffic Association, Inc. Tariff, which contains the general rule requiring consignee unloading of meat transported by 63 of the 74 participating carriers, with Plaintiffs Tompkins, Hyder, Watkins, and certain other specifically named carriers being the only exceptions.

The "Midwest to South Unloading Rule" as published in the Southern Mo-

tor Carriers Rate Conference Tariff requires consignees to unload certain types of meat transported by 34 of the 36 participating carriers, with Plaintiffs Refrigerated Transport and Alterman Transport Lines, Inc. being the only two exceptions.

Individual tariffs published by Watkins Motor Lines, Inc., and Central and Southern Truck Lines, Inc. generally did not provide for consignee unloading prior to November 18, 1968, while Argo-Collier's tariff provided for consignee unloading of most but not all meats.

Due to abusive practices by some of the consignees, carrier unloading proved to be burdensome, unduly expensive, and impractical and after a few years the carriers therefore filed with the ICC tariff schedules under which carrier unloading of loose and carcass meats would be discontinued on or about November 15, 1968. Plaintiffs contend that the only effect of these proposed changes was to cancel the exceptions contained in the previous Bureau and individual tariffs and thereby to put all carriers on an equal footing insofar as loading and unloading of meat is concerned so that all parties to the Bureau and individual tariffs were providing the same services at the same rates.

Various meat shippers and consignees filed petitions for suspension of the rule changes and the Interstate Commerce Commission, while refusing to suspend the changes, did enter into an investigation of the lawfulness of those changes. After a hearing before the Commission, the motor carriers who had made the above-described rule changes were ordered to cancel the changes and to return to the rules in effect prior to November 15, 1968. The Commission noted that there was much evidence of abuse flowing from the carrier unloading rules and it concluded that the carriers had shown adequate reasons for publishing line-haul rates which do not include unloading. It went on to hold, however, that there was merit to the contention by the meat packers and consignees that the effect of the proposed rules would be to diminish the quantum of transportation service performed and that plaintiffs had failed to sustain their statutory burden of proving that withdrawal of the unloading service without decreasing the line-haul rate was just and reasonable.

Plaintiffs contend that *rate* changes had not been sought by the carriers and that they were completely unaware that the question of rates would be considered by the ICC in connection with these rule changes. In support of this they point out that the Commission's notice of investigation indicated that the investigation concerned the lawfulness of the rules, regulations, and practices contained in the new provisions but made no reference whatever to rates. This, plaintiffs contend, did not serve notice that the reasonableness of *rates* would be considered, especially in view of the fact that the rates were the same ones they had used prior to instituting carrier unloading and the same ones which still are being used by those carriers who never have provided unloading services. Plaintiffs point out that the Review Board based its decision solely on the fact that plaintiffs had not provided economic justification for the rule changes and then went to elaborate lengths to point out how the carriers could show by representative evidence that the rates would be just and reasonable. However, when the carriers responded to that report by petitioning for reconsideration and for further hearings in order to present the "cost data" which the Board had held was required, Division 2 of the ICC acting as an Appellate Division rejected the petitions for further hearing because "sufficient grounds have not been presented to warrant granting the action sought."

Plaintiffs now contend that the ICC erred in the following ways:

(1) It violated both due process and § 554(b) of the Administrative Procedure Act (5 U.S.C. § 554(b))[3] by failing to give adequate and fair notice that the justness and reasonableness of rates

3. Section 554 of the Administrative Procedure Act (5 U.S.C. § 554) provides in pertinent part that

"(a) This section applies * * * in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, [with certain exceptions not relevant to this case].

"(b) Persons entitled to notice of an agency hearing shall be timely informed of—
(1) the time, place, and nature of the hearing;
(2) the legal authority and jurisdiction under which the hearing is to be held; and
(3) the matters of fact and law asserted."

would be an issue or the sole determinative issue, in the proceeding;

(2) It refused to consider evidence bearing upon the issue of rates when offered by plaintiffs, and it offered no rational explanation of its reasons for refusing to do so;

(3) It failed to make findings with respect to the National Transportation Policy, as set forth in 49 U.S.C. (preceding § 1), and other important issues which were before the Commission;[4]

(4) It failed to prescribe just and reasonable rules, regulations, and practices as required by 49 U.S.C. §§ 316(e) and 324a.

Defendants on the other hand contend that plaintiffs did have notice that the justness and reasonableness of rates would be in issue because, in effect, a change in quantum of service without a corresponding change in rate, *is* a change in rate. Plaintiffs and defendants agree that under Section 216(g) of the Interstate Commerce Act (49 U.S.C. § 316(g)) plaintiffs had the burden of proof to show that the proposed change was just and reasonable, but they disagree as to what the burden was. Plaintiffs contend that it related only to the reasonableness of the proposed rule itself, while defendants contend that the services rendered and the rates charged are so closely related that a tariff changing the former may not be found to be just and reasonable without considering the effect of the changed rule on the justness and reasonableness of the *rate*.

As to plaintiffs' allegation that the Commission's refusal to grant a rehearing was a clear abuse of discretion, defendants contend that refusal to hear additional evidence cannot amount to an abuse of discretion absent a showing of newly discovered evidence and that in the instant case the evidence plaintiffs wanted to submit at a rehearing was evidence which had been available to them all along. They also point out that plaintiffs could have introduced any evidence they wished merely by filing new papers with the Commission and starting the entire procedure all over again. Such a procedure would, of course, have provided another seven-month period during which the implementation of the proposed rules could have been suspended by the Commission whereas if the old proceedings had been revived suspension would not have been possible since more than seven months had passed since filing of the proposed rule change and the Commission no longer had the power to make the tariffs inoperative while the matter was pending before it.[5]

On November 28, 1969, an order was issued temporarily restraining defendants from enforcing the ICC's order of November 1969 to the extent that it required a cancellation of the rules requiring consignees to unload loose and carcass meats, and on March 23, 1970, a hearing on the merits was held before this three-judge court. At that hearing the Court ruled that the three motions to intervene which already had been filed would be allowed and orders to that effect have been entered accordingly.

Also at that hearing plaintiffs raised a question as to whether a related action pending in the Western District of Wisconsin should be transferred to this court and consolidated with the instant case. In the Wisconsin case Morrell and two other meat packers are seeking to have the ICC's order set aside insofar as it holds that plaintiffs have shown justification in principle for changing the

---

4. The National Transportation Policy as set forth in 49 U.S.C. provides, in general, that all provisions of the Act are to be administered and enforced with a view to providing for fair and impartial regulation of all modes of transportation subject to the provisions of the Act administered so as to preserve the inherent advantages of each and to promote safe, adequate, economical, and efficient service.

5. The record shows that plaintiffs recently have submitted for publication and approval by the ICC a proposed rule change and a proposed rate reduction. Approval of those would, of course, make the present controversy moot.

carrier-loading rule whereas in the instant case those same packers seek affirmance of the ICC's order insofar as it holds that the carriers have not carried their burden of showing that the rule change is reasonable and just. Plaintiffs adopted the position that the Wisconsin case and the instant case should be tried together, but the ICC opposed consolidation on the ground that the issue to be determined in the Wisconsin case is unrelated to the issue before this Court. In view of the ICC's strenuous objection, consolidation was not ordered.[6]

## DISCUSSION

■ Judicial review of administrative decisions is limited to a consideration of whether the facts as found by the administrative agency are supported by substantial evidence and whether the ruling is in accordance with the applicable law. Plaintiffs in the instant case do not contend that the Commission's findings are erroneous per se; rather, they contend that the Commission's order is unlawful in that it was based on the Commission's erroneous consideration of an issue which was not properly before it, *i. e.*, the reasonableness of plaintiffs' line-haul rates.

The record shows that until a few years ago all carrier tariffs placed upon consignees or shippers the responsibility for unloading loose and carcass meats. When some 14 carriers changed their tariffs to provide for carrier unloading of certain specified types of meat their rates were not adjusted to reflect the increased service but remained the same as those of carriers who continued to

follow the general rule of no carrier unloading. Furthermore, the extent of carrier unloading varied even among those carriers who elected to vary the general rule against unloading[7] but the line-haul rates remained the same for all carriers just as they had been before carrier-unloading was begun.

■ Effective November 16, 1968, plaintiff carriers amended their tariffs by deleting the carrier-unloading provision and again the line-haul rates were not changed to reflect the change in service. On November 20, 1968, in response to protests filed by the shippers and carriers the ICC served notice of investigation into "Unloading Restrictions on Meats and Packinghouse Products." The notice included the following statements with regard to the nature of the investigation:

*"It is ordered,* That an investigation be, and it is hereby, instituted into and concerning the lawfulness of the rules, regulations and practices contained in said schedules with a view to making such findings and orders in the premise as the facts and circumstances shall warrant.

*"It is further ordered,* That the investigation in this proceeding shall not be confined to the matters and issues hereinbefore stated as the reason for instituting this investigation, but shall include all matters and issues with respect to the lawfulness of the said rules, regulations and practices under the Interstate Commerce Act."

■ When the ICC's notice of investigation is read in conjunction with the applicable fair notice requirements of

---

6. We note, however, that there appears to be some inconsistency in the ICC's position. On the one hand the Commission is urging this Court to uphold the November order on the ground that rate justification is an indispensable part of the rule change issue and therefore was properly before the Commission in the administrative proceeding; on the other, it wants the rule-change aspect of the Commission's order litigated in a separate action because for that purpose they

consider it to be an entirely separate issue.

7. Refrigerated Transport and Alterman undertook to unload only when the unloading operation could be performed by one man, or in other circumstances if the consignee requested the driver's assistance; Argo-Collier's rule specifically provided for consignee unloading for all except frozen meats; the others had unloading rules which applied to all loose and carcass meats.

the Administrative Procedure Act (5 U. S.C. § 554(a), (b), *supra* n. 4)—which requires that notice be given of the nature of the hearing and the matters of fact and law asserted—it is evident that the investigation purported to be one into the reasonableness of the rules, not rates.[8] We reject defendants' contention that, under the facts of this case, an investigation into the reasonableness of rules necessarily imposes upon the carrier a duty to justify the reasonableness of its rates. The cases cited by defendants do not support that proposition and a fair reading of § 216(g) of the Interstate Commerce Act (49 U.S.C. § 316(g)) suggests that the law is otherwise. Section 216(g) provides that "at any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable." Rates, fares, charges, and classifications were obviously put into a separate category from rules, regulations and practices, and justification of one does not necessarily require justification of the other. In any quasi-judicial proceeding the right to a full and fair hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims one will be required to meet. Morgan v. United States, 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129 (1938). Absent actual or constructive notice that rates under a proposed new rule must be justified, the burden of proof in a rule-changing investigation would not extend to rate justification.

■ Defendants have cited language from previous ICC decisions which, taken out of context, supports their contention that to justify a change in service necessitates justifying the rates. For example, in the case upon which they primarily rely the Commission's report states that "it is as much an increase of rate to give less service for the same amount as to charge a greater amount for the same service." Merchants & Manufacturers Ass'n. v. Baltimore & Ohio R. R., 30 I.C.C. 388 (1914). That case, however, (like most of the cases which have been cited to this Court) was a rate case, in which plaintiffs assailed the *rates* as unreasonable, unjustly discriminatory, and unduly prejudicial. Clearly when the rate to be applied under a rule change is the subject matter of the investigation economic justification is called for, but it does not necessarily follow that rate justification is always necessary or even proper merely because a change in rules is sought.

Somewhat more in point is Detention of Vehicles, and Loading and Unloading Provisions, 329 U.C.C. 220 (1966), in which the changes which certain rail-

---

8. In oral argument the ICC appeared to contend that this case involved the Commission's rule-making power rather than its adjudicative power, and that § 554 of the Administrative Procedure Act therefore was not applicable. Such a contention clearly is without merit for the Commission's rule-making power relates to the formation and implementation of rules, regulations and policies by the ICC, not to a determination of the validity of a carrier's rules. 5 U.S.C. § 551(4), (5), (6), (7):

"(4) '[R]ule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval of prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

"(5) 'rule making' means agency process for formulating, amending, or repealing a rule;

"(6) 'order' means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

"(7) 'adjudication' means agency process for the formulation of an order; * * *."

road carriers proposed to make in rules providing for loading and unloading were denied because the carriers failed to carry their burden of showing the justness and reasonableness of the rule. Although absence of cost data was one of the factors considered by the Commission, it must be noted that, unlike the instant case, both the existing and proposed rules specifically provided that the line-haul rates included loading and unloading and that it was this specifically charged-for service which was to be changed. Furthermore, cost data was only one of the factors upon which the ICC based its decision that the proposed rules had not been justified. It did not, as here, find that the necessity for the rule change had been established but that failure to show cost data precluded a finding that the *rules* were unreasonable.

In that same case the Commission had under consideration the carriers' existing loading and unloading rules—an investigation which it had undertaken on its own motion. The existing rules were of two types: those providing that line-haul rates included loading and unloading "when this service can be performed by one man," and those providing that the line-haul rates included loading and unloading without restriction. The Commission found that the first type was unlawful because the language "when this service can be performed by one man" is vague and indefinite. The second type was found to be lawful, however, and when those opposing the existing rules sought to establish that the line-haul rates were unreasonable when unlimited unloading service was provided the Commission dismissed their contentions with the comment that reasonableness of line-haul rates was not at issue.

■ We recognize that as to whether line-haul rates are properly at issue there may well be a valid distinction between investigations of existing rules and investigations of proposed rules. But such a distinction has not been made in the cases cited to this Court and we believe that the distinction more properly is one between investigations into rules, whether existing or proposed, which affect services specifically included in the line-haul rates and those which do not. In the circumstances existing in the instant case we do not believe that plaintiffs can be charged with knowledge that their burden of justifying deletion of the carrier-unloading rule included economic justification of line-haul rates which had been in existence before the carrier-unloading rule was even adopted and which are still applicable (1) to those carriers who have never provided unloading services, (2) to Intervenor Indiana Refrigerated whose no-carrier unloading rule has been in effect since 1967, (3) to one plaintiff (Argo-Collier) whose tariff since 1967 has specifically provided that the line-haul rates do not include unloading of "loose, dry salt, sweet pickled and unpackaged meat and fresh meat, loose or in carcasses," and (4) to two plaintiffs (Alterman and Refrigerated Transport) whose tariffs have specified that the carrier will provide unloading only when one man can do the job, or in other cases when the consignee requests the driver to assist the consignee in unloading.

We have serious doubts as to whether in these circumstances plaintiffs, having demonstrated to the ICC's satisfaction the necessity for discontinuing carrier unloading, should be required to justify their line-haul rates at all, but we have no doubt whatever that in the absence of actual notice of the necessity for economic justification, and in light of the ICC's determination that the reasonableness of the rules could not be determined in the absence of rate justification, it was an abuse of discretion for the Commission to refuse to permit the carriers to present the evidence which the Commission held to be essential.

Accordingly, the Commission's orders of July 21, 1969, and November 10, 1969, are vacated and the case is remanded for additional hearings on the economic justification of line-haul rates.

On Motion for Reconsideration

■ This case is now before the Court upon a motion by the United States and the Interstate Commerce Commission to reconsider the Court's order of April 29, 1970, remanding the case to the Commission for additional hearings on the economic justification of line-haul rates. The Government's motion is based on the fact that neither the Court nor counsel for defendants adverted to the fact that the protests which the shippers filed with the Commission, after plaintiffs had filed tariffs containing a no-loading provision, raised the question as to whether retention of the same line-haul rates would be proper. The Government contends that this constitutes actual notice that line-haul rates would be an issue even though the Commission's Order of Investigation specifically stated that the Commission was undertaking an investigation into the lawfulness of the rules, regulations and practices contained in the tariffs. As noted in our previous order, the Administrative Procedure Act, 5 U.S.C. § 554(a), (b), requires the Commission to give notice of the nature of the hearing and of the matters of fact and law asserted. The Commission is not required to undertake an investigation into every issue raised by a protesting party, but when it does undertake an investigation the carriers whose tariffs are being investigated are entitled to rely upon the scope of the investigation as defined by the investigator. For the reasons set forth above and at pages 8 through 13 of the April order, we adhere to our view that the carriers cannot be charged with having actual notice that line-haul rates were under investigation and that it was an abuse of discretion for the Commission to refuse to permit the carriers to present evidence of line-haul rates after the Commission belatedly informed them that such evidence was essential.

The order of April 29, 1970, therefore, will not be disturbed, and judgment shall be entered accordingly.

It is so ordered.